**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

LOREN MITCHELL
MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

Date Submitted: November 14, 2023
Date Decided: May 2, 2024

Josiah R. Wolcott, Esquire
Connolly Gallaher LLP
267 East Main Street
Newark, Delaware 19711

Nikola Preradovic
234 S. Dillwyn Road
Newark, DE 19711

Rade Preradovic
5 Withams Road
Newark, DE 19711

RE: *Joseph W.C. Murray, Jr., et al. v. Nikola Preradovic, et al.*,
C.A. No. 2023-0601-LM

Dear Counsel and Parties:

Plaintiffs Joseph Murray and Danielle Murray move to enforce a contract. Plaintiffs allege the Defendants, Nikola Preradovic and Rade Preradovic, agreed to sell the portion of land at issue in this adverse possession claim. In the interim, Plaintiffs move to compel specific performance of the signed agreement. At the heart of the issue is the parties' disagreement about the bounds of the land to be purchased. For the reasons explained below, I find that the Plaintiffs failed to prove that the parties entered into an enforceable agreement because Defendants were mistaken as to the bounds of the lands described in the agreement of sale.

## I.    BACKGROUND[1]

### A.    The Fence

In December of 2022, the Preradovices purchased the property at 234 South Dilwyn in Newark, Delaware (the "Property") which was in in pretty "bad shape".[2] As a part of the purchase, they had a survey done to identify the boundaries of the land they were purchasing.[3]  A few days before settlement on the property, the Preradovices received the survey which identified that a portion of the Murray's fence encroached on the property.[4]  Their agent contacted the previous owners of the property and told them that the neighbors, the Murrays, had the fence installed a year prior.[5]  Despite the information, the Preradovices proceeded with the sale and engaged the attorney conducting the settlement, Vance Funk, who contacted the Murrays about the issue in a letter dated December 21, 2022.[6]

---

[1] For the purposes of this motion, the referenced facts are drawn from the complaint, answer, and briefing in this matter.   I grant the evidence the weight and credibility I find it deserves in accordance with the standard set forth herein.  Citations to the record are in the form of Docket Item ("D. I.") and identified by their entry number.

[2] D. I. 7; It took the Preradovices approximately four (4) months to prepare the property and for Nikola to move in.  *Id*.

[3] *Id*.

[4] *Id.*

[5] *Id.*

[6] *Id.*

The December 21st letter put the Plaintiffs on notice about the encroaching fence and offered three options to cure.[7] First, it gave the option for the Murrays to leave the fence as it was and purchase the land from the Preradovices for $30,000 plus any cost for the subdivision to be started on February 1, 2023.[8] Second, the letter suggested the Murrays could move the fence to the property line by April 30, 2023.[9] Third, the letter suggested the Murrays could remove the fence altogether to be completed by March 31, 2023.[10] Defendants requested a response by February 1, 2023.[11]

The Murrays officially responded to the December 21st letter in a subsequent letter dated January 15, 2023.[12] The response informed the Defendants that the fence predated their ownership and had been in place since the year 1980, and included several surveys purporting to support their claim.[13] The Murrays counter-offered the following solutions:

---

[7] D. I. 10 (Exhibit 1); D. I. 23 (Exhibit A).

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] D. I. 11 (Exhibit 2); D. I. 23 (Exhibit B).

[13] *Id.*

1.      [They] would pay a surveyor and fees to New Castle County to have the property line redrawn to include the disputed area of the fence and landscaping beside it up to the street line; or

2.      For a one-time payment of $3,000 [the Preradovices] grant us [the Murrays] a permanent easement of this area in perpetuity; or

3.      [The Murrays] would file suit to acquire the disputed land via adverse possession.[14]

The letter requested a reply by February 15, 2023.[15]

On February 1, 2023, the Preradovices responded to the Murray's counteroffer by letter.[16]  The Preradovices reiterated the desire to reach a mutually agreeable solution but also stated that they were "open to have conversations regarding the sale price of the land."[17]  They explained that redrawing the property lines would not be acceptable without "compensation to the land owner."[18]  As per the suggestion of an easement, the Preradovices rejected the idea, saying that it would "significantly decrease" the value of the land and deter future buyers.[19]  As

---

[14] *Id*.

[15] *Id*.

[16] D. I. 26 (Exhibit A).

[17] *Id*.

[18] *Id*.

[19] *Id*.

to the adverse possession claim, the Preradovices requested the contact information for the Plaintiffs' counsel to discuss.[20]

### B.     Email Exchanges

Between February 2023 and July 2023, when the agreement was signed, the parties engaged in a series of email exchanges regarding the encroachment.  In a March 27, 2023 email, the Preradovices confirmed to the Murray's attorney that they would be moving forward without an attorney.[21]  In a subsequent email to Rade Preradovic on March 31st, the Murrays' attorney, confirmed that the Murrays would like to purchase the "sliver of land at issue" directly from the Preradovices as opposed to obtaining an easement.[22]  He asked what Rade's position on "a proposal like that" would be.[23]  On March 31, 2023 at 5:36pm, Nikola Preradovic offered to sell the land to the Murrays for $10,000 or for them to rent it at $1,500 annually.[24]

On April 3, 2023, counsel for the Murrays responded to Nikola, informing him that the Murrays were meeting with a surveyor to determine the "'metes and

---

[20] *Id*.

[21] D. I. 14 at pg. 1.

[22] *Id.* at pg. 2-1; the emails submitted to the Court do not flow chronologically, as such, I read the email at the bottom of page 2 to be continued at the top of page 1.

[23] *Id.*

[24] D. I. 23 (Exhibit C); D. I. 14.

bounds' or property description of the sliver of land" at issue. [25] He also mentioned that the process could take several weeks.[26] Plaintiffs' counsel went on to confirm that the Murrays were willing to purchase the "sliver of property" for the price of $10,000.[27] He said that the Murrays were willing to pay for the "surveyor to create the property description[,]" and proposed that the parties "share the cost of a deed that will describe the transaction and describe the property as determined by the surveyor."[28]

On April 26, 2023 Plaintiffs' counsel emailed Nikola Preradovic informing him that the Preradovic's settlement attorney, Vance Funk, was working on a draft agreement of sale for the "sliver of land."[29] He told Nikola that the sale would be contingent on New Castle County approving the "'Property Line Adjustment'" and that the Murrays had already hired a surveyor that was taking care of the process.[30] He asked the Preradovics to be patient.[31] A few days later, on April 28, 2023

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] D. I. 14 at pg. 4.

[31] *Id.*

Plaintiffs' counsel sent Nikola Preradovic the proposed agreement of sale which included a legal description of the property to be sold.[32]

On May 3, 2023 Rade Preradovic responded to Plaintiffs' counsel with some "comments/edits" for the agreement of sale.[33]  He requested the following changes: (1) a clause in the contract ensuring that if the purchase doesn't go through for any reason, the $1,000 deposit will be released to the seller; (2) a clause ensuring if the purchase transaction doesn't happen for any reason, the seller would build a new fence on his property based on the original property lines; (3) that the full transfer tax would be paid by the buyer.; and finally he asked:

> (4) "Please explain to me how I know what piece of property the description is for?  I need some additional information to agree that this is the piece of land that we have been discussing.  I can't decipher the survey jargon provided therefore I need whomever [sic] wrote up the paragraph to explain what piece of land is described."[34]

On May 5, 2023 Plaintiffs' counsel provided comments to each of Rade's comments "in order as follows:" (1) as to the $1,000 deposit, he explained that the agreement contained a provision where if the Buyer defaults, the Seller gets his

---

[32] D. I. 23 (Exhibit C).

[33] D. I. 26 (Exhibit A).

[34] *Id.*

deposit back and if the Seller defaults, then the Buyer receives the deposit.[35]  If both parties go to closing, then the deposit is applied to the sale price and if the County denies the property line adjustment, then the deposit would go back to the Buyer. He assured Rade that this was all "very typical."[36] As to the possibility of Rade building a new fence, Plaintiffs' counsel warned that his clients would "seek, among other things, compensation for any damages" he caused.[37]  He noted that the issue did not need to be included in the agreement.[38] As to the transfer tax he said "[t]ypically, the transfer tax is split evenly between the parties."[39]  He ensured Mr. Preradovic that he would inquire about the amount of the transfer tax from the settlement attorney but made no promises about payment.[40]  As to the confusion with the legal description of the land, he said he would set up a meeting between he, Rade, and the surveyor to "make clear what the property is to be purchased."[41]

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

Later that day on May 5, 2023, Rade responded and stressed three points. First, he felt the security deposit should go to him in the event the County did not approve the transfer because he felt he deserved compensation for the harassment and delay to his own projects due to the threat of litigation from the Murrays.[42] The other point he made was that he was unwilling to pay any additional fees for the land transfer because they weren't asking to sell their land, he said, "if [the Murrays] want to buy the property, we are willing to sell it without any additional expense."[43] Lastly, he directed, "[i]instead of setting up the meeting with the surveyor and [Mr. Wolcott], we would rather see the newly proposed survey."[44]

Plaintiffs' counsel responded on May 12, 2023, but the full email was not provided to the court.[45] Then on May 19, 2023, Rade writes to Plaintiffs' counsel making him aware that he and Mr. Murray "had a friendly conversation." He states that Murrays made him aware that he and the petitioners had been working on another proposed agreement; he acknowledged that he was willing to proceed with

---

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

the transaction if the County approved it.[46]  He mentioned that he and the Murrays had discussed placing a temporary easement while they wait for the County to respond.[47]  He further stated, "[t]he options that we were in agreement with from day one are the only options that we'll agree to. . . either buy from us or they have to move their fence to their boundary line."

On May 26, 2023, Plaintiffs' counsel sent a draft agreement of sale for Rade's review.[48]  He informed Rade that the Murrays had decided not to move forward with the temporary easement to avoid extra paperwork.  He ensured him that he would still receive a non-refundable deposit of $1,000, which will be used for the purchase price of the land if the County approves the new line.[49]  Rade responded later that day in agreement with the temporary easement position.  He noted that they would not sign the agreement unless it specified that all tax transfer expenses would be covered by the buyer.  He also reiterated his request for the language to be added to the agreement to say that if the County does not approve the transfer, the Murrays

---

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

would have 15 days to move the fence to their boundary line.  He said they would not sign the agreement "unless those two things were addressed."[50]

### C.     The Agreement of Sale and Survey

On June 2, 2023, Plaintiffs' counsel sent a revised version of the agreement of sale to the Preradovices.[51]  This version said that the Murrays would pay the entire transfer tax amount.[52]  In addition, the email indicated that the Murrays would provide confirmation when the property line adjustment application had been submitted to the County and provide the Preradovices with a copy of the proposed survey.[53]  After some additional correspondence, the Plaintiffs signed the agreement of sale on July 13, 2023 and the Defendants signed on July 18, 2023.[54]  As part of the agreement of sale, the Plaintiffs provided the Defendants with the $1,000 non-refundable deposit that was discussed during negotiations.[55]

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] D.I. 23 (Exhibit C).

[55] *Id.* (Section 8 and 11 of Agreement of Sale).

The signed agreement of sale incorporates by reference an "attached legal description" of the land to be sold.[56] The attachment describes the property as:

> Being part of Lot 321. . . [b]eginning at a point on the westerly side of Halifax Road (50 feet wide), said point being further located North 05 degrees 49 minutes 23 seconds West, 58.36 feet from the northerly end of a twenty (20) feet radius junction curve joining said westerly side of Halifax Road with the northerly ride of South Dilwyn Road (50' wide);
>
> Thence from said point of Beginning, leaving said westerly side of Halifax Road, and by a line running through said Lot 321, North 83 degrees 40 minutes 54 seconds West, 102.93 feet to a corner in common for herin described lands with Lot 351;
>
> Thence on a common line with lands of said Lot 351, North 88 degrees 17 minutes 41 seconds East, 101.41 feet to said westerly side of Halifax Road;
>
> Thence, thereby, Southerly, along a 200.00 feet radius curve to the left, said curve having a chord bearing of South 03 degrees 45 minutes 51 seconds East and a chord distance of 14.34 feet, an arc distance of 14.38 feet to the point and place of Beginning.
>
> Containing within said described metes and bounds 727 square feet of land, be the same more or less.[57]

---

[56] D. I. 23 (Exhibit D, Signed Agreement of Sale).

[57] *Id.*

On July 19, 2023, Jill Myers, the surveyor, provided a "draft of the survey and lot line adjustment proposal" to counsel for the Plaintiffs and indicated "if all parties agree to this submission after review, the next step will be a submission to NCC for review."[58] The draft survey was provided to the Defendants on July 26, 2023, for review. [59] Rade Preradovic responded asking why the "newly proposed survey line is not the same as the fence line?"[60]  Counsel for the Plaintiffs responded that he would confirm with the surveyor, but believed the line used is the same as  what "is identified in the property description that was attached to the agreement of sale [] signed last week."[61] Defendant Rade Prepradovic's response indicated continued confusion between the property description and the survey, noting that from his perspective  the "discussion from the beginning was for the new line to be the fence line."  He stated that they were "not willing to give up more of [their] property" and "[couldn't] move forward" until the matter was resolved.[62]

---

[58]  D.I. 23 (Exhibits D & F).

[59] D.I. 23 (Exhibits F).

[60] *Id.*

[61] *Id.*

[62] *Id.*

On August 7, 2023, Defendant Rade Preradovic sent a follow up email asking for "confirm[ation] that the survey will be adjusted to the fence line…"[63] On August 14, 2023, counsel for Plaintiffs responded that he had "discussed in length" the possibility of redrawing the lot line.[64] He informed the Preradovices that the Murrays would "only be willing to discuss any changes to the proposed lot line if [the Preradovices agreed] . . . ." to assume the costs for any changes.[65] As such, he gave them three choices: (1) sign the current version of the survey based on the property description that is included; (2) agree to pay any additional costs by the surveyor in changing the lot line; (3) refuse to move forward with the agreement and re-start the litigation. Rade Preradovic replied to the email 4 hours later on August 14, 2023, asking to know what the additional cost would be.[66] Counsel for Plaintiffs responded on August 15, 2023, by giving them the contact information for Jill Meyers, the surveyor.[67] He stated that they would need to contact her directly, but noted that his clients would "ultimately need to agree on position [sic] of the new lot

---

[63] D.I. 23 (Exhibit G).

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] *Id.*

line" and amend the agreement of sale.[68]  Further, he provided something from the County which supported his claim that "it is recommended that fences be placed away from the property line . . . because they would not be able to maintain the [opposite side] of the fence facing [his] property."

Later, on the 15th, Rade responded to Plaintiffs' counsel indicating that "[t]he fence line [was] the only line [they] ever considered . . .."  On August 17, 2023, Plaintiffs' counsel communicated his position that, under Delaware law, the placement of the adjusted property line was "evidenced in [the Murrays'] January 15, 2023 letter" and "defined in the complaint. . .."  The parties went back and forth until August 21, 2023, when Rade Preradovic reached out to Plaintiffs' counsel suggesting a 50/50 split for the cost of having the survey adjusted.[69]  In an August 25, 2023 email, it was confirmed that the Murrays' were not willing to split the additional costs. [70]  About fifteen (15) minutes later Defendants responded to Plaintiffs' counsel telling him to "move on with litigation."[71]

---

[68] *Id.*

[69] *Id.*

[70] *Id.*

[71] *Id.*

### D.    Procedural History

Plaintiffs filed this Complaint accompanied by a Temporary Restraining Order ("TRO") and Motion to Expedite, on June 7, 2023, seeking adverse possession, or alternatively, a prescriptive easement or an easement by necessity regarding a strip of land "bound by the straight lines connecting three pipes located at the north end of 2334 S. Dillwyn, to which Plaintiffs claimed to have already adversely possessed.[72]   The motion to expedite and TRO were granted at a telephonic oral argument on June 26, 2023.[73]

On September 18, 2023, Plaintiffs filed a Motion to Enforce a Settlement agreement (the "Motion") between the parties and a Motion for Contempt.[74]   On September 21, 2023, Defendants responded to the motions.[75]   Plaintiffs replied on October 9, 2023.[76]   Following oral argument on the Motion to Enforce Settlement Agreement and the Motion for Contempt, I denied the Motion for Contempt and took the Enforcement motion under advisement.[77] This is my final report.

---

[72] D. I. 1.

[73] D. I. 17.

[74] D. I. 23-24.

[75] D. I. 26.

[76] D. I. 29-30.

[77] D. I. 36.

## II.    ANALYSIS

### A.    The Agreement of Sale is Unenforceable

A settlement is an agreement to resolve a disputed issue and is designed to prevent or end litigation.[78]  "Delaware law favors settlements and treats them as binding contracts."[79] Procedurally, "[t]he burden of proving that a valid contract existed—and its terms—is on the party seeking to enforce the contract, as well as the burden to convince this Court that specific performance is equitably warranted."[80]  The standard is a preponderance of the evidence.[81]  "No contract 'results [w]hen there has been no meeting of the minds on the [essential terms] of an agreement.' "[82]

Before me is a signed agreement that purports to sell the land at issue in this action and effectively settle this matter.  Plaintiffs argue that the contract is

---

[78] 15A C.J.S. Compromise & Settlement § 2.

[79] *Alston v. Pritchett*, 2015 WL 849689, at *2 (Del. Feb. 26, 2015) (citation omitted); *see also Loppert v. Windsortech, Inc.*, 865 A.2d 1282, 1285 (Del. Ch. 2004); *Rowe v. Rowe*, 2002 WL 1271679, at*3 (Del. Ch. May 28, 2002).

[80] *United Health All., LLC v. United Med., LLC*, 2013 WL 6383026, at *7 (Del. Ch. 2013).

[81] *Id.*

[82] *Rust v. Rust*, 2023 WL 3120545, at *7 (Del. Ch. Apr. 27, 2023), reargument denied, 2023 WL 3476501 (Del. Ch. May 16, 2023) (quoting *Creech v. Melnik*, 495 S.E. 2d 907, 912 (1998)).

enforceable because it is unambiguous.[83]  The Agreement of Sale contains a legal description of the land to be sold and the *pro se* Defendants argue that the agreement should not be enforced because they did not agree to a material term, the description of the land to be sold.[84]  In their reply, Plaintiffs liken Defendants' response to the defense of unilateral mistake and say that Defendants can't meet their burden for reformation of the contract because Defendants can't satisfy the heightened standard and prove by clear and convincing evidence that the agreement should not be performed.[85]  Plaintiffs also correctly note that the Defendants haven't actually requested reformation of the contract.[86]

However, as I see it, Defendants have called into question whether the parties had a meeting of the minds as to an essential term of the contract—the land to be sold.  This calls into question whether the parties ever had a settlement and ultimately, whether the Agreement of Sale is enforceable.

It is Plaintiffs burden to prove that the signed agreement before me properly memorializes the agreement between the parties, yet the evidence submitted shows

---

[83] D. I. 23 at ¶13.

[84] D. I. 26 at ¶5.

[85] D. I. 30 at ¶5.

[86] D. I.  30 at ¶5.

that at the time the agreement was signed by the Defendants, on July 18, 2023, the only description of the land available was the attachment provided with the agreement. The description is not one easily understood by a lay person. Because of this, Plaintiffs' counsel, in his May 5, 2023 email, offered to meet with the Defendants and the land surveyor to explain. An offer to which, was rejected by the Defendants. Instead, the Defendants reiterated that they only agreed to a boundary line of the fence, not beyond it.

The agreement also incorporates by reference the property line adjustment plan (the "line adjustment plan") conducted by Jill Meyers. The line adjustment plan was created and furnished to the Defendants a week after they signed the agreement, on July 26, 2023.[87] After signing the agreement, when the Preradovices saw the line adjustment plan, of which they did understand—unlike the legal description, they immediately repudiated the agreement. They informed Plaintiffs' counsel that the line adjustment plan did not depict their understanding of the original agreement between the parties.[88]

---

[87] D. I. 30 at 5.

[88] D. I. 23 (Exhibit D).

The line adjustment plan shows the adjusted property line going through two tree stubs currently behind the Murrays' fence.[89] Tree stubs that were created after Plaintiffs filed this action and after the Preradovices had the trees cut down.[90] The Plaintiffs maintain that the Defendants were aware of where the line would be because it's the same line drawn in the complaint for this litigation and the same line in the marked up version of the AESM plan that Plaintiffs provided in January 2023.[91] The Plaintiffs also note that the Defendants could have hired a professional to explain what the property description says.[92]

The Preradovices have consistently maintained that they were only willing to adjust their property line to the fence, and wanted payment for the land they were already missing from their property due to the Murrays' fence. Still willing to settle this matter, they requested to have the property line plan adjusted, and even agreed to pay for half of the $1200.00 fee to redraw the line.[93]

---

[89] D. I. 23 (Exhibit E).

[90] D. I. 14.

[91] D. I. 23 (Pl's. Motion to Enforce at 16).

[92] *Id.*

[93] D. I. 23 at Exhibit G.

Plaintiffs argue that they've always maintained the same description of the Land, and Defendants continue to stress their willingness to sell only that land encroached by the Murrays' fence. Consistently, even with the signed agreement, nothing has changed. It is clear to me that Defendants had not agreed to Plaintiffs' description of the land at the time they signed the agreement and certainly Defendants did not agree to sell all the land Plaintiffs requested in the Complaint. If it were so, there would be no dispute.

Plaintiffs suggest that Defendants are hiding behind their legal ignorance.[94] However from the evidence presented, it appears both parties believed they had an agreement, for one reason or the other. Almost immediately after signing the agreement, Defendants made it known that they did not understand the legal description[95], but signed the agreement based on their understanding of the agreement between the parties[96].

As for the material term of the land to be sold, the Plaintiffs have not established by a preponderance of the evidence that the Defendants agreed to the description as it is written or to the metes and bounds of the land originally depicted

---

[94] D. I. 29.

[95] D.I. 23 (Exhibits F).

[96] D.I. 30 (Exhibits A).

in the Complaint. Accordingly, there has been no meeting of the minds with respect to the specific lang to be sold, and the settlement agreement is unenforceable.

### i. Specific Performance of the Agreement

Plaintiffs alternatively request specific performance of the agreement. Under Delaware law, among other things, specific performance should be granted where a valid contract exists.[97] Because I find no valid contract exists, specific performance is unavailable here.

### ii. Attorney's Fees

To the extent the Plaintiffs seek attorney's fees under the bad faith exception to the American Rule, I find no bad faith and decline to award attorney's fees.

## III. CONCLUSION

For the foregoing reasons I deny Plaintiffs request to enforce the agreement of sale, for specific performance, and for attorney's fees. With no agreement between the parties, the $1,000 deposit should be returned to the Plaintiffs.

---

[97] *DeMarie v. Neff*, 2005 WL 89403, at *4 (Del. Ch. 2005) (quotation omitted).

This is a final report under Court of Chancery Rule 143 and exceptions may be filed under Court of Chancery Rule 144.

**IT IS SO ORDERED.**

Respectfully submitted,

*/s/ Loren Mitchell*

Magistrate in Chancery